# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

HANS HASEMANN,      :
  Plaintiff,       :
            :
   v.          :   CIVIL ACTION NO.
            :   3:11-cv-554 (VLB)
UNITED PARCEL SERVICE OF   :
AMERICA, INC.        :   FEBRUARY 26, 2013
  Defendant.      :

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #27]

Before the Court is a motion for summary judgment filed by the Defendant, the United Parcel Service of America, Inc., ("UPS"). The Plaintiff, Hans Hasemann ("Hasemann") brought this suit alleging that he was terminated because of his age in violation of both the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a) *et seq.* each depriving him of his pension benefits in violation of the Employee Retirement Income Security Act ("ERISA"). For the reasons stated hereafter, Defendant's motion for summary judgment is GRANTED.

### Facts

The following facts are undisputed unless otherwise noted. UPS employed Hasemann as an operations supervisor in its Watertown facility for nearly twenty-five years from February 1985 to January 12, 2010. [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶1]. On December 24, 2009, Hasemann went to UPS's

Watertown facility to assist a co-worker, Nelson Irizarry ("Irizarry"), with closing the facility. *Id.* at ¶3.  Irizarry and Hasemann came to the facility with Irizarry's wife and daughter.  [Dkt. #28, Ex.G].  Irizarry's wife waited in the car while his daughter helped to collect keys from vehicles.  *Id.*  Irizarry's daughter is neither a UPS employee nor yard-safety certified to enter the yard and collect keys.  [Dkt. #28, Def. Ex. G and Dkt. #29, ¶21].

While closing the facility, Hasemann and Irizarry encountered UPS's Security Supervisor John Pinchbeck ("Pinchbeck").  *Id.* at ¶4. Pinchbeck reported that Hasemann and Irizarry appeared to be intoxicated.  *Id.* at ¶5.  In a report dated December 28, 2009, Pinchbeck related that he encountered "Nelson Irizarry and Hans Hasemann who were about to be finished with the lock up of the facility.  Both appeared to be extremely jovial and boisterous.  There [sic] behavior was uncharacteristic from what I have seen in a work environment.  I immediately suspected that they had both been drinking.  I asked Nelson if he had and he replied yes.  I never asked Hans directly if he had been drinking.  Nelson invited me over to his house for cocktails after we were finished.  I declined by telling him that I just wanted to go home … While we were at the door [of a truck] Hans came over to show me that he had removed all the keys from all the package cars that were parked outside.  He then proceeded to dump all of the keys on the floor."  [Dkt. #28, Def. Ex. F].   Pinchbeck further reported that when they got to the "door at the end of primary near unload door 10, Hans said that I will show you that it is secure by running into it."  *Id.*

2

In response to Pinchbeck's report, USP's District Security Manager, Christopher Wheeler ("Wheeler") conducted an investigation. *Id.* at ¶6.  As part of the investigation, Wheeler interviewed Hasemann on December 29, 2009 and obtained a written statement from him. [Dkt. #28, Def. Ex. G].  Wheeler's notes from the interview indicate that when Hasemann was "asked if he drank before coming to assist with the lock up he stated yes, and he had no excuses."  *Id.*  Hasemann's written statement dated 12/29/2009 provided that on 12/24/2009 "I was at Nelson Irizarry house and he had told me he had to close … I wanted to assist my partner to close the Building to get him back to his family in a timely fashion.  Prior to going to the Building I had a glass of wine with my meal.  I know this was wrong and I will never do that again." [Dkt. #28, Def. Ex. A].

Hasemann contends that when he met with Wheeler to discuss the incident Wheeler said to him "Just take down this statement.  I'll tell you what to say.  This thing will go away. You know, just write down – I remember something along these lines – it will never happen again, and once this is done, we could forget it like a bad memory and move on, get past this and move on."  [Dkt. #37,Pl. Ex. A, Hasemann Dep., p. 29].  Prior to the interview on December 29, 2012, Wheeler and Hasemann had never met.  [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶10].

UPS has a published Alcohol Policy which provides that employees are not permitted to start or remain at work if they are using an alcoholic beverage, regardless of its alcoholic content.  *Id.* at ¶11.  The policy states that these "regulations also contain prohibitions against the use of alcoholic beverages by employees before they start work."  [Dkt. #28, Def. Ex. J].

On January 12, 2010, UPS terminated Hasemann's employment. [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶14].  UPS informed Hasemann that he was terminated because he violated the Alcohol Policy and engaged in conduct unbecoming of a supervisor.  *Id.* at ¶15.  UPS's Human Resource Manager for the Southern New England District, Dennis Ray ("Ray"), reviewed Wheeler's investigation and made the decision to terminate Hasemann's employment.  *Id.* at ¶16.  Ray testified that he was the "primary person responsible for making" the decision to terminate Hasemann's employment after conferring with Hasemann's division manager, Christopher Walsh, and others such as Wheeler.  [Dkt. #28, Def. Ex. I, Ray Dep., p. 16].  Walsh recommended to Ray that Hasemann be terminated. *Id.* at  41.  In coming to his determination, Ray reviewed a packet of information on the incident, including Pinchbeck's report as well as Hasemann's written statement in which he admitted that he had consumed a glass of wine.  *Id.* at  22, 24-25.   Ray explained that the primary issue that led to his decision was Hasemann's admitted violation of the alcohol policy.  Ray also noted that Hasemann had also made some "poor decision making by a supervisory standard."  *Id.* at  46.

Ray further testified that in coming to his decision to terminate Hasemann he was focused on Hasemann's violation of the alcohol policy.  *Id.* at  40.  Ray explained that the policy does "not focus on the level of toxicity in an employee" and so the question was not "whether or not he was intoxicated or not, but the employee did so identify that he had a glass of wine prior to report[ing] for work or showing up on property."  *Id.* at  30.  Ray further testified that he considered

4

the packet of information he received regarding the incident and UPS's alcohol policy "independently of any recommendation" he received from Walsh, Wheeler or anyone else.  *Id.* at  56.

    In reaching the decision to terminate Hasemann, Ray did not consider who Hasemann's replacement would be and played no part in the decision as to who would replace Hasemann and to this day does not know who did so.  [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶30].  UPS filled Hasemann's position with a previously-employed, twenty-six year old supervisor, James Burnette.  *Id.* at ¶31. UPS did not hire or promote Burnette to fill Hasemann's position but instead transferred Burnette from another supervisory position to Hasemann's position which was closer to Burnette's home.  *Id.* at ¶¶33-34.

    Ray did not supervise Hasemann nor had he ever met him prior to the incident on December 24.  *Id.* at ¶25.  At the time UPS terminated Hasemann, Hasemann was forty-four years old, Ray was forty-six years old, Wheeler was also forty-six years, and Walsh was forty-five years old.  *Id.* at ¶¶23-24.  The parties dispute whether Ray was aware of Hasemann's age when he made the decision to terminate Hasemann's employment.  Ray claims he was not aware of his age while Hasemann points out that Ray had access to, yet does not allege that he did access, records which indicated Hasemann's age.  [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶23].

    Following his termination, Hasemann availed himself of UPS's employee dispute resolution ("EDR") process pursuant to which an employee may appeal an adverse employment decision.  *Id.* at ¶37.  On January 12, 2010, Hasemann

submitted an EDR peer review request form.  [Dkt. #28, Def. Ex. N].  In the form,

Hasemann admitted that he violated the alcohol policy, by stating that during

dinner on December 24, 2009 "I consumed one glass of red wine" and "was not

intoxicated while on the property."  *Id.*  He also stated that Pinchbeck was "upset

and angry that he had to return to work because he had not been able to reach

Nelson [Irizarry] to confirm he was in fact closing the facility for the holiday" and

that he believed that he had been "victimized by a disgruntled employee who filed

a patently false statement against" him.  *Id.*

In July 2010, Hasemann filed a complaint with the Connecticut Commission

on Human Rights and Opportunities ("CHRO").  [Dkt. #29, Def. Local Rule 56(a)(1)

Statement, ¶53].  In his CHRO complaint, Hasemann denied having consumed

alcohol before returning to work on December 24, 2009.  *Id.*  When asked why he

admitted on numerous occasions that he consumed alcohol on the night of

December 24,2009, Hasemann testified that Irizarry's wife informed him at some

point after his employment had been terminated that the wine had been non-

alcoholic.  *Id.* at ¶54.  Hasemann testified that about "a month later after I got

terminated or something I was having dinner at Nelson's house, somewhere

around that time.  Could have been two weeks.  I don't know.  I had dinner at

Nelson's house, and his wife poured me a glass of wine.  I asked her what type of

wine it was.  She said, It's the only wine that I drink.  And, you now, at that point

in time I asked her, Was that the wine that you had poured me the night that were

– had Christmas Eve?  She said,Yes."  [Dkt. #28, Def. Ex. E, Hasemann Dep., 85-

86].  He further testified that he wasn't sure exactly when he found out that the

wine was non-alcoholic, he stated it "could have been February.  I know it was the wintertime, somewhere along the lines."  *Id.* at 86.   Hasemann further testified that he did not tell anyone at UPS when he first learned about the non-alcoholic wine.  *Id.*  He wasn't sure if he learned about it during the EDR process.  *Id.* Hasemann testified that prior to filing his affidavit with the CHRO, the only people besides his attorney that knew he had been served a non-alcoholic glass of wine were Irizarry and Irizarry's wife.  *Id.* at 106.   On the contrary, in an affidavit dated August 13, 2012, Hasemann contradicts his deposition testimony stating that before his EDR hearing he was informed by Irizarry's wife about the non-alcoholic wine and that he presented this information verbally "and in the form of the empty non-alcoholic wine bottle at my EDR hearing." [Dkt. #37, Pl. Ex. D, ¶¶12-13].

In support of his age claim, Hasemann asserts that two of his superiors made ageist comments towards him.   Hasemann stated in an affidavit dated November 12, 2010 that "[i]n the months leading up to my termination, a superior of mine, specifically James Marciano, asked on more than one occasion 'Are you getting to old to perform this job?'"  [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶3]. Hasemann could not recall exactly when Marciano made those comments or how many times he made such a comment. [Dkt. #29, Def. Local Rule 56(a)(1) Statement, ¶¶45-46].  Marciano was fifty one years old at the time of Hasemann's termination.  *Id.* at ¶24.  Hasemann also attested that "[i]n the months leading up to my termination, a superior of mine, specifically Chris Walsh, told me 'the young guns are kicking your butt.'"  [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶4].

Hasemann further attests in that he had "no control over the accompaniment of Mr. Irizarry's daughter to the UPS facility on that night. Mr. Irizarry invited her to [sic] in the car with us. I was dropped at the front door of the facility and Mr. Irizarry and his daughter drover [sic] off to the check the perimeter of the facility. I did not see Mr. Irizarry's daughter again until she was inside the facility with her father. It was common practice for UPS managers to bring their children to the facility during business." [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶¶7-9].

Hasemann also asserts that the UPS benefit plan has changed from a pension to a 401(k) match program. [Dkt. #36, Pl. Local Rule 56(a)(2) Statement, Disputed Issues of Material Fact,¶19].

### Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party,

8

summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341 (VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011).  Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

   I.    ADEA claim

   Hasemann alleges that UPS unlawfully discriminated against him on the basis of his age.   Under the ADEA, claims of discriminatory treatment are analyzed using the burden-shifting framework set forth in *McDonnell Douglas Corp., v. Green*, 411 U.S. 792, 802 (1973).  *Nieves v. Angelo, Gordon & Co.*, 341

Fed.Appx. 676, (2d Cir. 2009).[1]  Under the *McDonnell Douglas* framework, "the plaintiff bears the initial burden to establish a prima facie case of age discrimination by showing "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that the action occurred under circumstances giving rise to an inference of discrimination." *Attard v. City of New York*, 451 Fed. Appx. 21, 23 (2d Cir. 2011) (internal quotation marks and citation omitted).  "If the plaintiff succeeds in making out a prima facie case, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment action.  Upon the employer's proffer of such a reason, the presumption of discrimination 'drops from the picture' and the plaintiff must come forward with evidence that the proffered reason is a mere pretext for discrimination.  In order to satisfy [his] burden at the final stage, the plaintiff must prove, by a preponderance of the evidence, that age discrimination was the 'but-for' cause of the challenged adverse action." *Id.* (citations omitted).[2]

---

[1] The Supreme Court has recently noted that it "had not definitively decided whether the evidentiary framework of *McDonnell Douglas* … is appropriate in the ADEA context," *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2349 n. 2 (2009). Nonetheless, the Second Circuit has concluded that post-*Gross* the *McDonnell Douglas* framework is still applicable to ADEA claims.  *Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 92, 106 (2d Cir. 2010) (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit"); *Hrisinko v. N.Y.C. Dep't of Educ.*, 369 F.App'x. 232, 234 (2d Cir. 2010) (finding that employees must now prove that "age was the 'but-for' cause behind the employer's adverse decision, and not merely one of the motivating factors.")

[2] The Supreme Court in *Gross* recently altered the *McDonnell Douglas* formulation applicable to ADEA claims by "eliminating the mixed-motive analysis that circuit courts had brought into the ADEA from Title VII cases" and requiring

Here, Hasemann has established the first three elements of his prima facie case. It is undisputed that Hasemann was within the protected age group and experienced an adverse employment action.  Although, neither Hasemann nor UPS have directly presented evidence that Hasemann was qualified for his position, it is undisputed that Hasemann was employed for UPS for nearly twenty-five years when he terminated which suggests he was qualified for his position. Considering that the burden to establish a *prima facie* case is "minimal" or "*de minimis*," the Court therefore finds this element to be satisfied.  *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005).  However, the parties dispute whether Hasemann can establish that his termination occurred under circumstances giving rise to an inference of discrimination.   Hasemann argues that an inference of discrimination is demonstrated by the ageist comments made by his two superiors and the fact that he was replaced by a much younger worker.  UPS argues that those comments are nothing more than stray remarks and that it did not hire a much younger worker to replace Hasemann but simply transferred an already employed worker to fulfill the position.

Typically "an employer's decision to replace an older worker with a significantly younger one can support an inference of intentional age discrimination even when both persons are ADEA class member." *O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312-13 (1996).  However, the Second Circuit has instructed that "an ADEA plaintiff who is replaced by a significantly younger worker must offer some evidence of a defendant's knowledge as to the

---

evidence that age was the but-for cause of the adverse employment action. *Gorzynski*, 596 F.3d at 106.

significant age discrepancy to support a *prima facie* inference of discriminatory intent." *Woodman*, 411 F.3d at 90.  In viewing the facts in the light most favorable to the plaintiff, the Court will assume that the transfer of a younger worker into Hasemann's position is equivalent to being replaced by a younger worker. However, despite the fact that Ray had access to records which listed Hasemann's age, Hasemann cannot prove Ray had knowledge of the significant age discrepancy in light of the undisputed facts that Ray did not consider who Hasemann's replacement would be, played no part in the decision as to who would replace Hasemann and to this day does not know who did so.   Because Ray played no part in deciding who replaced Hasemann, no reasonable juror could conclude that the fact that he was ultimately replaced by a younger worker supports an inference that Ray fired Hasemann because of unlawful age discrimination.

Besides the fact that Hasemann was replaced by a younger worker, his only other evidence of age-related bias are the allegedly ageist comments made by two of his superiors in the months leading up to his termination.   First, Marciano asked Hasemann allegedly on more than one occasion "are you getting too old to perform this job?" [Dkt. #28, Def. Ex. Q, Hasemann Aff., ¶3].  Second, Walsh once told Hasemann that "the young guns are kicking your butt."  *Id.* at ¶4. Defendant argues that these comments are stray remarks and are not probative of discriminatory intent.

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory

statements and a defendant's decision to discharge the plaintiff." *Silver v. N. Shore Univ. Hops.*, 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007). "Often, however, an employer will argue that a purportedly discriminatory comment is a mere 'stray remark' that does not constitute evidence of discrimination." *Id.* "Although courts have often used the term 'stray remark' to refer to comments that do not evince a discriminatory motive, the Second Circuit has found that the term 'stray remark' 'represented an attempt-perhaps by oversimplified generalization-to explain that the more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination.'" *Galimore v. City University of New York Bronx Community College*, 641 F.Supp.2d 269, 284 (S.D.N.Y. 2009) (quoting *Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115 (2d Cir. 2007)).

"Accordingly, the task is not to categorize remarks 'either as stray or not stray,' and 'disregard [remarks] if they fall into the stray category,' but rather to assess the remarks' 'tendency to show that the decision-maker was motivated by assumptions or attitudes relating to the protected class.'" *Id.* (citation omitted). Courts have found the following factors relevant to such a determination: "(1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decision making process." *Silver*, 490 F.Supp.2d at 363 (citations omitted). "In the absence of a clearly demonstrated

nexus to an adverse employment action, stray workplace remarks are insufficient to defeat a summary judgment motion." *Almonord v. Kingsbrook Jewish Medical Center*, No.04-CV-4071(NGG), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007) (citing *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 56 (2d. Cir. 1998)).

It is well established that "the stray remarks [even] of a decision-maker, without more, cannot prove a claim of employment discrimination." *Abdu-Brisson v. Delta Airlines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

Although Marciano's comments could be viewed as discriminatory by a reasonable juror, the comments were not made in relation to the employment decision at issue and were not related to the decision making process.  Moreover, there is no evidence that Marciano played any role in the decision to terminate Hasemann.   Courts have routinely held that "stray remarks by [] non-decisionmakers are insufficient, without other evidence, to raise an inference of discrimination."  *Adam v. Glen Cove School*, No.06-CV-1200(JFB), 2008 WL 508689, at *8 (E.D.N.Y. Feb. 21, 2008); *Beshty v. GM,* 327 F.Supp.2d 208, 213 (W.D.N.Y. 2004) ("alleged remark was made by someone who had no involvement in plaintiff's termination, months before the termination occurred. That is not enough to give rise to a genuine issue of material fact."); *Georgy v. O'Neill,* No. 00 Civ. 0660(FB), 2002 WL 449723, at *6 (E.D.N.Y. Mar. 25, 2002) (finding that

14

reference to national origin by non-decisionmaker six months prior to termination was "the kind of isolated stray remark insufficient, without more, to raise an inference of discrimination and defeat summary judgment").  This Court agrees that Marciano's comments qualify as stray remarks as there is no discernible nexus between Marciano's comments and Ray's decision to terminate Hasemann for violating the UPS alcohol policy and engaging in conduct unbecoming of a supervisor months later.  No reasonable juror could conclude on the basis of Marciano's isolated comments that Hasemann's termination by Ray occurred under circumstances giving rise to an inference of discrimination.

While Walsh's "young guns" comment could also be viewed as discriminatory by a reasonable juror when viewed in the light most favorable to the plaintiff, the comment was neither made in relation to the employment decision at issue nor was it related to the decision making process.  Further, Walsh made this comment months prior to the December 24, 2009 incident which led to Hasemann's termination.  Comments too remote in time and context cannot support an inference of discriminatory intent. *See,e.g., Almonord*, 2007 WL 2324961, at *9 (holding that comment made at least five months before plaintiff's termination was "not sufficient to create an inference of discrimination"); *Buckman v. Caylon Sec. (USA) Inc.*, 817 F.Supp.2d 322, 336 (S.D.N.Y. 2011) (finding that "[a]lthough a reasonable juror could find that the remark itself was discriminatory," a remark made in isolation five months before plaintiff's discharge was "too remote in time and context to support a reasonable inference" that discharge was a result of race discrimination); *Legendre v. Chase*

15

*Manhattan Bank,* No 94 CIV. 2911(JES), 1996 WL 514874, at *1, 6 (S.D.N.Y. Sept. 10, 1996) (finding that remark "[i]f you don't like it here, why don't you go back to Ethiopia" eight months before plaintiff's termination "too remote in time and place" to create rational inference of employer's discriminatory intent)*; Ray v. Tandem Computers, Inc.,* 63 F.3d 429, 434–35 (5th Cir.1995) (single use of explicit, offensive sexual term directed to terminated female employee, made years before the termination, "is stray remark too remote in time to support an inference of sex discrimination.").

Although Ray did ask Walsh for his opinion on whether Hasemann's termination was warranted, there is no evidence that Ray's decision to terminate Hasemann was overly influenced by Walsh's recommendation and not the product of Ray's independent assessment and conclusions regarding the December 24, 2009 incident as will be further discussed below.  Even assuming that Walsh could be considered a decision-maker in Hasemann's termination, his "young guns" comment was too remote in time and context to support a reasonable inference that his termination was the result of age discrimination.  In the absence of a nexus between the time, place and context of Walsh's remark and Ray's ultimate decision to terminate Hasemann for violating UPS's alcohol policy, Walsh's comment can only be considered a stray remark.

Bolstering this conclusion is the "well-recognized inference against discrimination … where the person who participated in the allegedly adverse decision is also a member of the same protected class." *Drummond v. IPC Intern., Inc.,* 400 F.Supp.2d 521, 532 (E.D.N.Y. 2005).  Consequently "if a decision

maker is in same protected class as plaintiff, claims of discrimination become less plausible." *Id.* (citing *Toliver v. Community Action Comm'n to Help the Economy, Inc., CACHE,* 613 F.Supp. 1070, 1074 (S.D.N.Y.1985)); *Williams v. Brooklyn Union Gas Co.,* 819 F.Supp. 214, 225 (E.D.N.Y.1993) (dismissing age discrimination claims where the employees responsible for the plaintiff's termination were older than plaintiff or approximately the same age); *Pisana v. Merril Lynch & Co., Inc.,* No.93Civ.4541(LMM), 1995 WL 438715, at *5 (S.D.N.Y. July 24, 1995) (finding that fact that decision makers were close to plaintiffs age or older "weakens any suggestion of age discrimination."); *Browne v. CNN Am., Inc.,* No. 98 Civ. 1768, 1999 WL 1084236, at *4 (S.D.N.Y. Dec. 1, 1999) ("The fact that ... the ultimate decision maker[ ] was a member of the [same] protected class [as Plaintiff] enhances the inference that age discrimination was not the motive behind ... [the] termination of [Plaintiff].") (internal quotation marks and citation omitted).  At the time of Hasemann's termination, Walsh was actually one year older than Hasemann.  Indeed all of the individuals who played any role in Hasemann's termination were older than Hasemann.  Both Ray and Wheeler were forty-six years old and Walsh was forty-five years old.  Indeed, Marciano who played no role whatsoever in the decision to terminate Hasemann was fifty-one years old.  The fact that both Walsh and Marciano were older than Hasemann fatally undermines any inference of discrimination that could possibly be drawn by the mere fact that the comments could be viewed as discriminatory by a reasonable juror when viewed in the light most favorable to the plaintiff.

17

In view of the facts that no inference of discrimination can be drawn by the replacement of Hasemann by a younger worker, Marciano and Walsh's comments qualify as stray remarks, and the inference against discriminatory intent on basis that all of the decision-makers are in the same protected class as the plaintiff, no reasonable juror could conclude that Hasemann's termination occurred under circumstances giving rise to an inference of discrimination.

Even assuming arguendo that Hasemann had established his prima facie case, UPS has articulated a legitimate, non-nondiscriminatory reason for terminating Hasemann's employment due to his violation of the alcohol policy and for engaging in conduct unbecoming a supervisor by permitting Irizarry's daughter to help close the facility.   For the same reasons that Hasemann failed to establish an inference of discrimination, he fails to demonstrate that UPS's proffered reason is a mere pretext for discrimination and that age discrimination was the "but-for" cause of his termination.   Considering that stray remarks cannot support an inference of discrimination to establish a prima facie case, it is not surprising that stray remarks are also insufficient to demonstrate that an employer's legitimate, non-nondiscriminatory reason for its action is pretext for discrimination. *See,e.g., Jones v. Carolina Freight Carriers Corp.*, No. Civ.3:94CV2095(AHN), 1997 WL 911827, at *6 (D. Conn. Mar. 24, 1997) ( holding that "isolated remark is, without more, insufficient proof of pretext in the face of an employer's well-documented non-discriminatory reasons for its employment decisions."); *Windover v. Sprague Tech.,* 834 F.Supp. 560, 567 (D.Conn.1993) (statements referring to older employees as "old boys" insufficient to prove

pretext in ADEA case) (citing cases); *Getschman v. James River Paper Co., Inc.,* 822 F.Supp. 75, 78 (D.Conn. 1993) (supervisor's remark that "it sometimes is difficult to teach an old dog new tricks," "too slender a reed to carry the weight of the charge" in ADEA case where employer presented evidence of non-discriminatory reason), *aff'd,* 7 F.3d 221 (2d Cir.1993); *O'Connor v. Viacom Inc. / Viacome Intern. Inc.,* No.93Civ.2399(LMM), 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996) (holding that "three isolated remarks, the only proffered evidence of national origin discrimination are insufficient to establish pretext."). No reasonable juror could conclude on the basis of Marciano or Walsh's stray remarks, that UPS's reasons for terminated Hasemann were a pretext for age discrimination.

Hasemann devotes a significant portion of his brief in opposition to summary judgment and his Local Rule 56(a)(2) statement arguing in essence that Ray's conclusion that Hasemann violated UPS's Alcohol Policy was erroneous. Hasemann argues that he did not violate the Alcohol Policy because he consumed non-alcoholic wine despite his initial belief to the contrary and argues that UPS's investigation of the incident was subjective relying on Pinchbeck's unsupported observations. [Dkt. #37, Mem. in opposition to Summary Judgment, p. 13-18.]. The Parties dispute when Hasemann learned that he consumed non-alcoholic wine and when, if ever, he informed UPS. Even after crediting the Plaintiff's most favorable version of the facts, it is uncontroverted that Hasemann only informed UPS that he learned that he consumed non-alcoholic wine only after Ray made the decision to terminate his employment on January 12, 2010.

Consequently, the fact that Hasemann only learned after the fact that he had not consumed alcohol cannot demonstrate that Ray's decision in January 12, 2010 was a pretext for age discrimination.   Even assuming Hasemann had consumed non-alcoholic wine, he was unaware of this fact and did not inform UPS or it until after his termination.   At the earliest, he informed UPS that he consumed non-alcoholic wine orally and demonstrably at his EDR hearing.

Even assuming he had done so, a reasonable jury would not believe that UPS's decision not to credit Hasemann's contradictory and self-serving statements evinced age discrimination.   It is axiomatic that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984); *Hlinko v. Virgin Atlantic Airways, Ltd.,* 205 F.3d 1323 (2d Cir. 1999).   The majority of Hasemann's arguments boil down to the contention that UPS fired him either on the basis of erroneous facts or for no good reason at all.   But the "ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age." *Norton v. Sam's Club*, 145 F. 3d 114, 120 (2d Cir. 1998); see also *Freeman v. Package Mach. Co.,* 865 F.2d 1331, 1341 (1st Cir.1988) ("ADEA does not stop a company from discharging an employee for any reason (fair or unfair) or for no reason, so long as the decision does not stem from the person's age.");   *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988) ("Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to

establish a genuine issue of fact as to the credibility of the employer's reasons. Thus, the reasons tendered need not be well-advised, but merely truthful.") (citations omitted). Here, the record is devoid of sufficient evidence to support a reasonable fact finder's conclusion that UPS fired Hasemann because of his age. The fact that a younger employee transferred to fill Hasemann's position, the allegedly ageist remarks made months prior by Marciano and Walsh who were older than Hasemann, nor the fact that Hasemann later learned that he did not consume alcoholic wine are insufficient to establish pretext nevertheless demonstrate that age was the but-for cause of UPS's decision to terminate Hasemann's employment.

Lastly assuming arguendo that Walsh's comments were not stray remarks, Hasemann has failed to demonstrate the UPS should be held liable for employment discrimination based on the discriminatory animus of an employee who did not make the ultimate employment decision.  Hasemann appears to argue that since Walsh was biased and recommended to Ray that he be terminated there is a genuine issue of material fact in dispute over whether his termination was a pretext for age discrimination.

Although not raised by the parties, Hasemann appears to be advancing a cat's paw theory of liability.  The cat's paw theory[3] of liability has been the subject

---

[3]    The Supreme Court has explained that the "term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by [Judge] Posner in 1990."  *Staub*, 131 SCt. at 1190 n. 1.  In the fable, "a monkey induces a cat by flattery to extract roasting chestnuts from the fire.  After the cat had done so, burning its paws in the process, the monkey leaves the cat with nothing."  *Id.*  The Supreme Court explained that "[a] coda to the fable (relevant only marginally, if at all, to

of a recent Supreme Court decision which involved employment discrimination under the Uniformed Services and Reemployment Rights Act ("USERRA").  *Staub v. Proctor Hosp.*, ----U.S.----, 131 S.Ct. 1186 (2011).  In *Staub*, the Supreme Court considered "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision."  131 S. Ct. at 1189.  In a "cat's paw" case, a plaintiff typically seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.  The Supreme Court held that a plaintiff may establish "cat's paw" liability under USERRA "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under USERRA."  131 S.Ct. at 1198.  The Supreme Court explained that "[p]roximate cause requires only 'some direct relation between the injury asserted and the injurious conduct alleged,' and excludes only those 'link[s] that are too remote, purely contingent, or indirect.'"  *Id.* at 1192 (quoting *Hemi Group LLC v. City of New York*, 559 U.S. 1, 130 S.Ct. 983, 989, 175 L.Ed.2d 943 (2010)).

The Supreme Court declined to "adopt a hard-and-fast rule" in cat's paw cases which would immunize an employer who performs an independent investigation and exercises judgment independent on the other hand from the allegedly biased supervisor.  *Staub*, 131 S.Ct. at 1193.  The Supreme Court

employment law) observes that the cat is similar to princes who, flattered by the king, perform services on the king's behalf and receive no reward."  *Id.*

explained that "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action" then the employer will not be liable. *Id.* However, "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* The Supreme Court further explained that its holding, contrary to the dissent's characterization, reflected the longstanding principle that an employer should only be liable when it had delegated part of the decision making power to the biased supervisor. *Id.* The Supreme Court reasoned that "if the independent investigation relies on facts provided by the biased supervisor – as is necessary in any case of cat's-paw liability – then the employer (either directly or through the ultimate decision maker) will have effectively delegated the fact finding portion of the investigation to the biased supervisor." *Id.* Although the Supreme Court's decision involved USERRA, courts have applied Staub's holding to ADEA and Title VII cases. *See Rajaravivarma v. Bd. of Trustees for Connecticut State Univ. Syst.*, 862 F.Supp.2d 127, 149-50 (D. Conn. 2012).

Although the Second Circuit has never formally recognized "cat's paw" or conduit liability, the Second Circuit and districts courts within the Circuit have recognized theories of attributive subordinate bias in employment discrimination cases. *See Saviano*, 2011 WL 4561184, at *7 n.15 (noting that while the Second Circuit has not formally recognized the "cat's paw" theory, it has "held that bias at any stage of a decision process can taint the ultimate decision in violation of

Title VII").  Accordingly, the theory of liability that the "impermissible bias of a single individual can infect the entire group of collective decision makers…at least when the decision makers are overly deferential to the biased individuals' recommendations" is one that is well accepted by courts within this Circuit. *Baron v. N.Y. City Dep't of Educ.*, No.06-CV-2816 (FB)(MDG), 2009 WL 1938975, at *6, 8  (E.D.N.Y. 2009) (finding in an ADEA action that since the evaluations made by allegedly biased subordinate made up only a portion of the plaintiff's file that negated "any inference that the committee that made the termination decision was tainted by [the subordinate's] alleged bias") ; *see also*, *Fullard v. City of New York*, 274 F.Supp.2d 347, (S.D.N.Y. 2003) ("[T]he employer will be liable where the decision-maker 'rubber stamps' the recommendation of [biased] subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive." (citations, internal quotation marks and citations omitted); *Britt v. Merrill Lynch & Co., Inc.,* No.08CV5356, 2011WL 4000992, at *8 (Aug. 26, 2011) (considering whether Plaintiff had alleged facts establishing a cat's paw theory of liability).

Assuming that Walsh was biased against older workers, there is no evidence that Walsh's recommendation was a causal factor in Ray's decision to terminate Hasemann as is necessary to establish cat's paw liability.  Ray testified that he reviewed and considered the packet of information he received regarding the incident and UPS alcohol policy independently of any recommendation he received from Walsh, Wheeler or anyone else.  Ray further testified that his decision was driven by Hasemann's written statement admitting that he

consumed alcohol prior to starting work which in Ray's opinion constituted a violation of UPS's Alcohol Policy.  No reasonable juror could conclude that Ray was overly deferential to or rubber-stamped Walsh's recommendation.

Moreover there is no indication that Ray's independent investigation relied on facts provided by Walsh.  It is undisputed that the facts of the investigation that Ray independently assessed were provided by Pinchbeck and Wheeler who are not alleged to be biased against older workers.  Further, the record indicated that Pinchbeck wrote-up the incident describing Hasemann's conduct of his own volition and without any involvement by Walsh.  Walsh provided neither impetus for Hasemann's termination nor did he provide facts concerning the incident which led to his termination to Ray.  No reasonable juror could conclude that Ray delegated the fact finding portion of the investigation to Walsh.   Although, Plaintiff argues that Ray testified it was possible that he discussed Hasemann's job performance with Walsh, Hasemann has presented no evidence that Ray's decision to terminate Hasemann was predicated on that discussion and Walsh's assessment of Hasemann's job performance.  Even viewing the facts in the light most favorable to Hasemann, no reasonable juror could conclude that Walsh's recommendation to Ray was the proximate cause of Ray's decision to terminate Hasemann to establish cat's paw liability.   For all the foregoing reasons, the Court grants UPS's motion for summary judgment on Hasemann's ADEA claim.

II.    CFEPA claim

CFEPA claims have traditionally proceeded under the same analysis as ADEA claims. *McInnis v. Town of Weston*, 375 F. Supp. 2d 70, 85 (D.Conn. 2005).

However, it is unclear whether age discrimination claims under CFEPA should still proceed under the same standard as the ADEA in light of the Supreme Court's recent decision in *Gross* altering the standard.  Although the Second Circuit has recently applied the "but-for" standard to a CFEPA claim, *see Timbie v. Eli Lilly & Co.,* 429 Fed. Appx. 20, 22 n. 1 (2d Cir.2011), at least one Connecticut court has determined that under CFEPA, a plaintiff is only required to prove that age discrimination was a contributing or motivating factor, rather than a "but-for" reason for the adverse employment action. *Wagner v. Bd. of Tr. for Connecticut State Univ.,*No. HHDCV085023775S, 2012 WL 669544, at *12 (Conn.Super. Ct. Jan.30, 2012).

In addition, this Court has previously held that until Connecticut courts adopt a new standard, it will follow existing Connecticut court pronouncements on the appropriate standard to employ in applying Connecticut law and apply a contributing or motivating factor analysis to CFEPA claims.  *See Herbert v. Nat'l Amusements, Inc.*, 833 F.Supp. 2d 192, (D. Conn. 2011); *see also Weber v. FujiFilm Medical Sys. U.S.A., Inc.*, 854 F.Supp. 2d 219, 231 n.7 (D. Conn. 2012). Therefore under CFEPA, once the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff must only come forward with evidence that the proffered reason is a mere pretext for discrimination and does not have to demonstrate that his age was the "but-for" cause of the adverse action.   For the same reasons that Hasemann's ADEA claim fails, his CFEPA claim likewise fails because he cannot establish an inference of discrimination for his prima facie case nor can he establish that UPS's proffered

reason for terminating him was a mere pretext for unlawful age discrimination. The Court therefore grants UPS's motion for summary judgment on Hasemann's CFEPA claim.

### III.   ERISA claim

Section 510 of ERISA provides that "[i]t shall be unlawful for any person to discharge ... a participant or beneficiary [of an employee benefit plan] ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...." 29 U.S.C. § 1140.   "Section 510 was designed primarily to prevent "unscrupulous employers from discharging or harassing their employees in order to keep them from obtaining vested pension rights." *Dister,* 859 F.2d at 1111.   "To prevail on a claim under this statute, the plaintiff must show that her employer 'was at least in part motivated by the specific intent to engage in activity prohibited by § 510.'" *Zahler v. Empire Merchants*, LLC,No.11-cv-3163(JG), 2012 WL 273698, at *10 (E.D.N.Y. Jan. 31, 2012) (quoting *Dister,* 859 F.2d at 1111).   "On the other hand, '[n]o ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment.'" *Dister*, 859 F.2d at 1111 (quoting *Titsch v. Reliance Grp., Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982)). However, an employer's specific intent is "seldom the subject of direct proof"; "[e]mployers of a mind to act contrary to law seldom note such a motive in their employee's personnel dossier." *Id.*   The Second Circuit therefore applies the familiar *McDonnell Douglas* burden-shifting framework to Section 510 claims.  *Id.*

"Where an employee's ERISA claim is based only on a claim that the employee has been deprived of the opportunity to accrue additional benefits through more years of employment, a prima facie case requires some additional evidence suggesting that pension interference might have been a motivating factor." *Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997).   The "Plaintiff is required to prove more than the single fact that his termination precluded him from vesting into the ... Plan; he must demonstrate [his employer's] unlawful purpose in firing him." *Dister,* 859 F.2d at 1111.

Hasemann argues that to best of his knowledge he would have begun earning a pension at UPS at the age of fifty-five and because UPS terminated him it was "initiating a cost savings."  [Dkt. #37, p. 19].  Hasemann's argument is really an assertion that UPS must have violated ERISA because loss of pension benefits was a consequence of terminating his employment.  Consequence and cause are not synonymous.  A cause is a reason why something occurs and a consequence is the result of the occurrence.  The fact that loss of pension benefits is a routine consequence of a termination does not ineluctably mean that the consequence was the reason for the termination and thus alone cannot support an ERISA cause of action.  *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.,* 703 F.Supp. 2d 230, 249 (E.D.N.Y. 2010) (plaintiff "has simply not come up with any circumstantial evidence at all that a reasonable fact-finder might rely upon to determine that his termination was in some part driven by his employer's intent to interfere with his enjoyment of his benefits. Rather, the record makes plain that the foreclosure of early retirement was merely an unfortunate consequence of,

instead of a motivation behind, defendant's decision to fire plaintiff."). Hasemann has presented no evidence that pension interference was a motivating factor in UPS's decision to terminate his employment. No reasonable juror could therefore conclude on the basis of the record before the Court that Hasemann's termination was really a scheme to deprive him of pension benefits. The Court therefore grants UPS's motion for summary judgment on Hasemann's ERISA Section 510 claim.

## Conclusion

For the foregoing reasons, the Court GRANTS UPS's [Dkt. #27] motion for summary judgment. The Clerk is directed to enter judgment in favor of Defendant UPS and close the case.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: February 26, 2013